**MUNICIPAL DEFENSE GROUP, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Texas Eastern Transmission Corporation, et al., Intervenors.**

**No. 97–1673.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1999.

Decided March 26, 1999.

Stanley W. Balis argued the cause and filed the briefs for petitioner.

Andrew K. Soto, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Before: EDWARDS, Chief Judge, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

On May 1, 1997, Texas Eastern Transmission Corporation filed tariff revisions with the Federal Energy Regulatory Commission proposing to implement a change in the method by which the gas pipeline allocated forward-haul firm capacity that became available on its system, primarily due to contract expiration. In the past, Texas Eastern had allocated available firm capacity[1] to its customers on a first-come, first-served basis. Now it proposed to grant that capacity to the

---

1. Firm transportation service or "firm capacity" is a type of transportation service for which delivery is guaranteed, as opposed to interruptible transportation, "for which delivery can be delayed if all the capacity on the pipeline is in use." *See United Distribution Cos. v. FERC*, 88 F.3d 1105, 1123 n. 10 (D.C.Cir.1996); 18 C.F.R. §§ 284.8(a)(3), 284.9(a)(3).

customer whose request would generate the greatest net present value to Texas Eastern. In determining net present value, only the customer's reservation charge would be considered. The Commission accepted Texas Eastern's filing in an order on May 29, 1997, and affirmed its decision in an order on rehearing on September 11, 1997. *See Texas Eastern Transmission Corp.*, 79 F.E.R.C. ¶ 61,258 (1997); *Texas Eastern Transmission Corp.*, 80 F.E.R.C. ¶ 61,270 (1997). The Municipal Defense Group ("MDG"), a group of publicly-owned gas distribution companies which take service under Texas Eastern's small customer transportation service rate schedule ("rate schedule SCT"), petitioned this court for review of the Commission's orders. MDG argues that the orders unduly discriminate against Texas Eastern's small customers, and that the Commission failed to meet the requirements of § 5 of the Natural Gas Act, 15 U.S.C. § 717d. For the following reasons, we sustain the Commission's resolution of these contentions.

I

Texas Eastern's small customers obtain firm transportation service under rate schedule SCT, a two-part discounted rate. The pipeline provides this rate schedule pursuant to a settlement with its small customers, reached during Order No. 636 restructuring. *See Texas Eastern Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,086 (1993). Texas Eastern defines a small customer as one with a maximum contract demand quantity of 5,987 Dth (dekatherms) per day.[2] *See id.* at 61,085. Within that service level requirement, Texas Eastern offered the discounted rate to those who either were customers of Texas Eastern under certain rate schedules as of October 31, 1992 or had purchased firm sales service from an interstate pipeline which in turn purchased a firm sales service from Texas Eastern under certain rate

schedules as of May 18, 1992. *See id.* at 61,085–86. By the terms of rate schedule SCT, small customers pay a discounted reservation charge representing approximately 40% of the charge large customers pay under rate schedule CDS.[3] *See id.* at 61,086 & n. 38. Small customers also pay a usage charge equal to the usage charge for service under Texas Eastern's rate schedule IT–1, a rate developed at the 100% load factor, exclusive of gas supply realignment costs.[4] *See id.* at 61,086, 61,072.

Rate schedule SCT is an exception to the general rate structure Texas Eastern adopted following Order No. 636. Pursuant to that order, Texas Eastern switched from a modified fixed/variable ("MFV") to a straight fixed/variable ("SFV") rate design. *See id.* at 61,084; Order No. 636, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939, at 30,434 (1992). A pipeline using an MFV rate design places fixed costs in both the reservation and usage charges; an SFV rate design confines fixed costs to the reservation charge and variable costs to the usage charge. *See United Distribution Cos. v. FERC*, 88 F.3d 1105, 1128–29 & n. 25 (D.C.Cir.1996). In Order No. 636, the Commission ordered all pipelines to adopt a straight fixed/variable transportation rate design in order to achieve its goal: "to ensure that all shippers have meaningful access to the pipeline transportation grid so that willing buyers and sellers can meet in a competitive national market to transact the most efficient deals possible." *See* Order No. 636–C, 78 F.E.R.C. ¶ 61,186, at 61,766 (1997); *see also City of Nephi v. FERC*, 147 F.3d 929, 931 (D.C.Cir.1998). The Commission believed the MFV rate design distorted the unit delivered prices of gas, and thereby hindered the development of an efficient national market for gas. *See* Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, at

---

**2.** A dekatherm is a metric system measurement that is roughly equivalent to 1,000 cubic feet of gas.

**3.** Rate schedule CDS is a no-notice transportation service whereby a customer may increase deliveries up to its maximum daily quantities at any time. *See Texas Eastern Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,072 (1993).

**4.** A pipeline charges a reservation or "demand" charge for reserving firm transportation capacity and a usage charge for the actual transportation of gas. *See United Distribution Cos.*, 88 F.3d at 1129 n. 24.

30,596 (1992); *see also United Distribution Cos.*, 88 F.3d at 1167–68.

The Commission recognized, however, that adoption of the SFV rate design could shift costs among classes of a pipeline's customers. *See* Order No. 636, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939, at 30,435 (1992). Low load factor customers in particular would pay a higher share of the pipeline's fixed costs under SFV than they had under the MFV rate design.[5] *See id.; see also United Distribution Cos.*, 88 F.3d at 1170–71. To offset these cost shifts, the Commission required pipelines to adopt several mitigation measures. If the transition to SFV rates resulted in an increase of 10% or more in revenue responsibility for any specific class of customers, the pipeline was required to phase in the new rates over a four year period. *See* Order No. 636, F.E.R.C. Stats. & Regs.(CCH) ¶ 30,939, at 30,435–36 (1992); 18 C.F.R § 284.14(b)(3)(ii)(B)(1995) (rescinded) [6]; *see also City of Nephi*, 147 F.3d at 932. Pipelines who offered sales or firm transportation service to small customers on a one-part volumetric basis, at an imputed load factor, as of May 18, 1992, were required to continue to offer firm and no-notice service on the same basis.[7] *See* Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, at 30,600 (1992); 18 C.F.R. § 284.14(b)(3)(iv)(A) (1995) (rescinded); *see also United Distribution Cos.*, 88 F.3d at 1171. Although Texas Eastern and its small customers designed their own measure—the discounted SCT rate schedule—it also "represent[ed] a mitigation against cost-shifting." *See Texas Eastern*

*Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,086 (1993).

Order No. 636 did not address how pipelines should allocate their own available capacity. The issue was to be considered in future restructuring proceedings. *See* Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, at 30,548 (1992). Before its May 1997 filing, Texas Eastern had allocated firm capacity that became available on its system on a first-come, first-served basis, with the Commission's approval. *See Texas Eastern Transmission Corp.*, 78 F.E.R.C. ¶ 61,154, at 61,644 (1997). Small customers could obtain available capacity at their rate schedule SCT as long as they were first in line. When MDG protested Texas Eastern's proposal to allocate capacity based on the net present value of a customer's request, considering only the customer's reservation charge, Texas Eastern and MDG discussed the matter and came to an agreement. Texas Eastern then submitted a pro forma tariff sheet containing language the parties had agreed upon: Texas Eastern would deem a small customer's request for available capacity at the maximum SCT rate to generate a net present value equal to a request for capacity for an equal term at the maximum rate under rate schedules FT–1 and CDS.[8] A small customer's request at the maximum SCT rate would be deemed to generate a greater net present value than a request under FT–1 or CDS at less than the maximum rate for an equal or shorter contract term.

Because it was submitted too late for review, the Commission did not consider Texas Eastern's submission in its initial order. The

---

5. A customer's "load factor" is the ratio between its average and peak usage. Customers with seasonal usage fluctuations have low load factors; customers with constant usage throughout the year have high load factors. *See United Distribution Cos.*, 88 F.3d at 1129 n. 26. Most small customers are also low load factor customers.

6. 18 C.F.R. § 284.14 was rescinded in October 1995, following the completion of the restructuring process. *See* Filing and Reporting Requirements for Interstate Natural Gas Company Rate Schedules and Tariffs, 60 Fed.Reg. 52,960, 53,058 (1995).

7. A one-part volumetric rate combines both the reservation charge and the usage charge into one

usage charge payable when a customer actually ships gas, and "reflects an 'imputed load factor' that is higher than the customer's anticipated use of the pipeline." *See City of Nephi*, 147 F.3d at 931 n. 5. Before restructuring, Texas Eastern offered rate schedule SGS, a one-part volumetric rate, to its small customers, due to the small amount of service those customers required. *See Texas Eastern Transmission Corp.*, 32 F.E.R.C. ¶ 61,056, at 61,155 (1985).

8. Rate schedule FT–1 is an open-access, instantaneous transportation service. Unlike CDS no-notice service, changes in scheduled volumes must be requested a minimum of 24 hours in advance. *See Texas Eastern Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,072 (1993).

Commission approved the pipeline's original filing as an "economically efficient way of allocating capacity and consistent with Commission policy." *See Texas Eastern Transmission Corp.,* 80 F.E.R.C. ¶ 61,270, at 61,-978 (1997). In its compliance filing, Texas Eastern again submitted the pro forma tariff sheet and the Commission rejected it in its order on rehearing. Reviewing Texas Eastern's original filing and the proposed modification under § 4 of the Natural Gas Act, 15 U.S.C. § 717c, the Commission determined that small customers currently contract for capacity at a subsidized rate and are not entitled to that subsidized rate when they seek to expand their capacity. *See id.* at 61,977–78. Texas Eastern later complied with the Commission's decision and moved to place its original filing, without the revision, into effect. The pipeline has now intervened in this case in support of the Commission.

## II

 We first take up petitioner's claim that § 5 and not § 4 of the Natural Gas Act applies to Texas Eastern's proposal to allocate available capacity based on the net present value of a customer's request for capacity. Section 4 governs a pipeline's proposal to change an existing tariff and requires the pipeline to prove that the proposed rate or charge increase it seeks is just and reasonable. *See* 15 U.S.C. § 717c(e). Section 5 permits the Commission to determine and fix by order a just and reasonable rate or practice if it finds, "any rate ... or ... practice ... affecting such rate [to be] ... unjust, unreasonable, unduly discriminatory, or preferential." *See* 15 U.S.C. § 717d(a). If the Commission acts on its own initiative, it bears the burden of proof; it must show not only that its proposed rates or charges are just and reasonable, but that those it would alter are not. *See Public Serv. Comm'n v. FERC,* 866 F.2d 487, 488 (D.C.Cir.1989).

Although Texas Eastern filed the initial proposal to change its capacity allocation method, petitioner insists that § 5 governed the proceedings. Because Texas Eastern twice submitted a pro forma tariff sheet altering its initial filing, petitioner contends that Texas Eastern essentially discarded its

original filing and supported the revision only. As petitioner sees things, the Commission's acceptance of the original filing transformed the Commission into the proponent of rate reform and required it to meet the standards of § 5.

To accept petitioner's contention would be to contradict *Consolidated Edison Co. v. FERC,* 165 F.3d 992 (D.C.Cir.1999) (per curiam). Texas Eastern was the source of the proposed change and, as we held in that case, the Act makes the source decisive when choosing between the two sections. *See id.* at 1008. The Commission's acceptance of Texas Eastern's original proposal placed the proceeding in § 4. *See Western Resources, Inc. v. FERC,* 9 F.3d 1568, 1574 (D.C.Cir. 1993); *City of Winnfield v. FERC,* 744 F.2d 871, 875 (D.C.Cir.1984). Texas Eastern never withdrew its initial filing and it did not seek rehearing of the Commission's May 1997 order accepting that filing instead of the modification. *See Texas Eastern Transmission Corp.,* 79 F.E.R.C. ¶ 61,258 (1997). After the Commission's order on rehearing, Texas Eastern moved to place its original filing, without the modification, into effect. Therefore, § 4 applied and the Commission was not required to establish that Texas Eastern's prior allocation method was unjust or unreasonable.

## III

 Petitioner's remaining challenge is on the basis that Texas Eastern's new allocation method unduly discriminates against small customers by effectively barring them from obtaining available capacity at their rate schedule SCT. Texas Eastern will allocate capacity based on the net present value of a customer's request, taking into account the customer's reservation charge but not its usage charge. Because small customers pay a discounted reservation charge under rate schedule SCT, they will generally lose to larger customers who request capacity under rate schedules CDS or FT–1, which have higher reservation charges. This "effective bar" allegedly caps small customer capacity at the amount the small customers had contracted for as of May 29, 1997, the date of the Commission's order in this case. The Commission acknowledged the difficulty fac-

ing small customers bidding for available capacity at their rate schedule. *See Texas Eastern Transmission Corp.*, 80 F.E.R.C. ¶ 61,270, at 61,977 (1997). But it reasonably determined that they should compete for available capacity on the same terms as Texas Eastern's other customers.

MDG does not challenge Texas Eastern's new allocation method as a general matter. It argues that small customers are a separate class on Texas Eastern's system, and should therefore receive special treatment with respect to allocation of available pipeline capacity. The argument rests, at least partly, on the small customers' agreement with Texas Eastern, approved by the Commission, which entitles small customers to take capacity under the discounted, preferential rate schedule SCT. A customer requiring up to 5,987 Dth per day may contract for capacity under that schedule. MDG claims that by effectively barring small customers from receiving available capacity above their current contract amounts, up to the maximum available under their rate schedule, the Commission has precluded them from enjoying the benefits of their agreement.

The trouble is that the small customers' agreement with Texas Eastern simply permits them to receive capacity under the discounted rate schedule if their service level requirements fall within the 5,987 Dth maximum. *See Texas Eastern Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,085 (1993). The small customers were not guaranteed full ceiling capacity, as the Commission correctly recognized. *See Texas Eastern Transmission Corp.*, 80 F.E.R.C. ¶ 61,270, at 61,979 (1997). They must bid in competition with unsubsidized bidders. This will doubtless make it more difficult for small customers to obtain additional service under the subsidized rate schedule, but there is no reason why the Commission should have commanded other pipeline customers to subsidize them.

Historically, small customers on Texas Eastern's system have been treated as a separate class and so MDG thinks they should have been treated as such in this proceeding. *See, e.g., Texas Eastern Trans-*

*mission Corp.*, 57 F.P.C. 500, 508–09 (1977), *aff'd sub nom. Elizabethtown Gas Co. v. FERC*, 636 F.2d 1328, 1334 (D.C.Cir.1980). But as MDG must acknowledge, small customers are already receiving preferential treatment—they contract for capacity under a discounted rate schedule. The Commission reasonably concluded that Texas Eastern need not extend the subsidy beyond the bounds of its agreement with the small customers. *See Texas Eastern Transmission Corp.*, 80 F.E.R.C. ¶ 61,270, at 61,978 (1997). A Commission order requiring the pipeline to do so would have had to confront the principles underlying Order No. 636. The SCT rate schedule "represent[ed] a mitigation against cost shifting" to small customers during restructuring. *See Texas Eastern Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,086 (1993). Although the SCT rate schedule is not a one-part volumetric charge (the mitigation measure required for small customers), it serves the same general purpose and the Commission approved it for that reason. *See id.* Such mitigation measures were not meant as "a permanent shield to increased costs." *See City of Nephi*, 147 F.3d at 932. They simply sought "to preserve the status quo" for small customers at the time Order No. 636 took effect. *See id.* Pipelines were required to "grandfather[ ] [in] in existing small customer discount rates" only; they were not required to give additional discounts or preferences. *See id.* at 931. MDG complains that small customers are effectively grandfathered in at their current levels of capacity under the discounted SCT rate schedule, but it does not explain why small customers are entitled to acquire additional available capacity at a discounted rate intended to serve as a mitigation measure. The Commission points out repeatedly, and, we think, correctly, that small customers who already obtain subsidized capacity have no entitlement to increase their capacity at the same subsidized rate.[9] *See Texas Eastern Transmission Corp.*, 80 F.E.R.C. ¶ 61,270, at 61,977–79 (1997).

We also believe it significant that the SCT rate is itself an exception to the SFV rate

---

9. Petitioner also contends that the SCT rate is not a "subsidized" rate, because small customers make a substantial contribution to fixed costs

through the usage charge despite their discounted reservation charge. But because small customers also do not pay gas supply realignment

design that Order No. 636 generally requires, and is therefore somewhat at odds with the Order's broader goal of encouraging competition in the national gas market. Texas Eastern's small customer SCT rate is a two-part rate in which fixed costs are placed in both the reservation and the usage charges, the same rate structure rejected by the Commission in Order No. 636 as contrary to its goals. *See* Order No. 636, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939, at 30,433–34 (1992). Given those general goals, it was certainly reasonable to confine application of the SCT rate design to capacity that Texas Eastern's small customers have contracted for and to require small customers seeking additional, available capacity to bid on an equal footing with larger customers taking capacity under a straight fixed/variable, unsubsidized rate design. Small customers are not categorically barred from obtaining available capacity above that which they currently contract for. They simply must compete for it on equal terms with other customers on Texas Eastern's system.

*The petition for judicial review is denied.*

costs and because their usage charge is based on a 100% load factor, they pay less in fixed costs for the same amount of capacity than a large customer, even at a relatively high load factor. Their rate does not reflect a full allocation of fixed costs and is therefore a subsidized rate. *Texas Eastern Transmission Corp.,* 80 F.E.R.C. ¶ 61,270, at 61,979 (1997).