**EXXON CORPORATION,
et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

Consolidated Edison Company of New
York, Inc., et al., Intervenors.

No. 97–1092.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 13, 2000.

Decided March 24, 2000.

Thomas J. Eastment argued the cause for petitioners. With him on the briefs were Marc C. Johnson, Bruce A. Connell, Jennifer S. Leete, Linda L. Geoghegan and Michael L. Pate.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel. John H. Conway, Deputy Solicitor, entered an appearance.

Marc Richter, Harvey L. Reiter, Richard Arlen Rapp, Jr., James H. Byrd, L. Clifford Adams, Jr., Allen Weinberg, Kenneth R. Carretta, John E. Holtzinger, Jr., Jacolyn A. Simmons and Kevin M. Downey were on the brief for intervenors. Kent K. Carter, Joel F. Zipp, Michael J. Fremuth, J. Paul Douglas and Mary L. Wright entered appearances.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Dissenting opinion filed by Circuit Judge RANDOLPH.

STEPHEN F. WILLIAMS, Circuit Judge:

This case arises out of the Federal Energy Regulatory Commission's "unbundling" of interstate gas pipelines' sales and transportation service. As part of that unbundling, parties with firm rights to buy natural gas in the downstream areas served by Transcontinental Gas Pipe Line Corporation ("Transco") were given the right to convert their gas purchase entitlements into transportation service rights. They evidently all did so, and are known as the "FT conversion shippers." When Transco reached an unbundling settlement with its customers, these conversion shippers sought assurance that their rights to use of the pipeline upstream would be sufficiently firm. FERC responded affirmatively, insisting that Transco give the service a priority that rendered it "essentially firm." *Transcontinental Gas Pipe Line Corp.*, 55 FERC ¶ 61,446 at 62,345–46 (1991) ("Settlement Order").

Ranged against the conversion shippers are "Indicated Shippers," led by Exxon, who are gas producers in Transco's production areas. They contend that if the conversion shippers are to enjoy firm transportation service in the production areas, they should pay for it in the way that is predominant for firm transportation service, i.e., by a two-part charge—first a reservation charge for the right to use the service, and second a usage charge covering the costs of actual usage.

Transco filed tariffs under § 4 of the Natural Gas Act, 15 U.S.C. § 717c, proposing such two-part rates, designating them "firm-to-the-wellhead" or "FTW" rates. (Petitioners note that this is technically a misnomer; the rates in fact would go only as far as producers' gathering systems. But, as have all the participants, we use the FTW label.) The Commission rejected the FTW rates, *Transcontinental Gas Pipe Line Corp.*, 76 FERC ¶ 61,021 ("Opinion No. 405"), denied rehearing, 77 FERC ¶ 61,270 (1996) ("Opinion No. 405–A"), and finally issued a further "Order on Rehearing and Request for Clarification," 79 FERC ¶ 71,205 (1997), adhering to the rejection. The Indicated Shippers petition for review.

The Indicated Shippers also attack prior decisions in which the Commission rejected two-part FTW rates that Transco had proposed under § 5 of the Act, 15 U.S.C. § 717d, *Transcontinental Gas Pipe Line Corp.*, 63 FERC ¶ 61,194, rehearing denied, 65 FERC ¶ 61,023 (1993). We do not address those decisions directly. In the § 4 cases, we find no reasoned decision-making to support the Commission's rejection of Transco's filings. If on remand the

Commission adheres to that rejection and justifies it, the Indicated Shippers' ability to secure relief under § 5 will probably be remote; if on remand the Commission accepts the Indicated Shippers' position under § 4, then of course they will need no relief under § 5.

*    *    *

At stake are rates governing gas transportation on "laterals" linking gas producers' gathering systems with Transco's main pipelines. Transco was an early unbundler, reaching an unbundling settlement with its customers in 1991. When FERC reviewed the settlement, representatives of the FT conversion shippers sought assurance of high priority for their use of these laterals. (The service is dubbed "IT-feeder service"; nominally interruptible, it feeds the conversion shippers' entitlements to mainline capacity.) FERC agreed, ordering that

> Transco's tariff should specifically set forth the capacity priority of Rate Schedule IT feeder service, i.e., that such service is not firm but that it has priority over any other interruptible service regardless of the date of the service agreement.

Settlement Order, 55 FERC at 62,377. As everyone understood at the time, including FERC, this grant of priority made Transco's IT-feeder service for the FT conversion shippers "essentially firm." *Id.* at 62,346. But the Commission did not direct two-part rates for this "essentially firm" service, and it has been subject to only a single volumetric usage charge.

In 1992 the Commission adopted Order No. 636, extending its restructuring of the gas industry. See *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation under Part 284 of the Commission's Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol,* FERC Stats. & Regs. ¶ 30,939 (1992). One of its goals was the creation of a "national gas market" with "head-to-head, gas-on-gas competition where the firm transportation rate struc-

ture is not a potentially distorting factor in the competition among merchants for gas purchasers at the wellhead and in the field." *Id.* at 30,434. To this end, FERC ordered that when pipelines provide firm transportation with a two-part fee structure, all fixed costs are allocated to the reservation charge so that the usage charge is based only on variable costs. This new rate design was called "straight fixed variable" ("SFV"). It replaced "modified fixed variable" ("MFV") pricing, under which the usage charge for any two-part rate included a portion of a pipeline's fixed costs. See *United Distribution Cos. v. FERC,* 88 F.3d 1105, 1167–68 (D.C.Cir. 1996) (upholding FERC's abandonment of modified fixed variable pricing); see also 18 CFR § 284.8(d). With MFV the pipelines had varied in their allocation of fixed costs to the usage charge, and "[t]he Commission believed the MFV rate design distorted the unit delivered prices of gas, and thereby hindered the development of an efficient national market for gas." *Municipal Defense Group v. FERC,* 170 F.3d 197, 199 (D.C.Cir.1999). With SFV the Commission hoped "to promote competition at the natural gas wellhead by increasing the transparency of natural gas pricing." *Texaco Inc. v. FERC,* 148 F.3d 1091, 1094 (D.C.Cir.1998).

■ Because conversion from MFV to SFV often contradicted contracts between pipelines and purchasers, the Commission could require SFV only by invoking its authority to modify private contracts under the so-called "*Mobile-Sierra* doctrine." See *Texaco Inc.,* 148 F.3d at 1096–97; see also *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Under *Mobile-Sierra,* FERC may modify a contract rate provision if (but only if) the "public interest" so requires, a standard understood by all to demand more of a showing by FERC, in rejecting rates, than is needed to reject rates under the "just and reason-

able" standard of § 5. See *Papago Tribal Utility Auth. v. FERC,* 723 F.2d 950, 953 (D.C.Cir.1983); *Northeast Utilities Service Co. v. FERC,* 993 F.2d 937, 960 (1st Cir. 1993). In part because of FERC's insistence that the MFV rate design will "distort gas market pricing to the detriment of the 'integrated national gas sales market,' " we have upheld FERC's abrogation of private contracts to convert natural gas pricing to SFV. See *Texaco,* 148 F.3d at 1097. Nonetheless, in the § 5 proceeding alluded to at the outset of the opinion, the Commission rejected Transco's effort to establish a two-part SFV rate for the IT-feeder service enjoyed by Transco's conversion shippers.

Following a Commission suggestion, Transco made a § 4 filing that proposed two-part SFV rates in the production areas. An administrative law judge to whom the Commission referred the matter rejected the rates on various grounds. *Transcontinental Gas Pipe Line Corp.,* 72 FERC ¶ 63,003 (1995). Transco and Indicated Shippers filed exceptions with the Commission, which in its decision dropped nearly every aspect of the ALJ's analysis save the conclusion—that the proposed rates were unjust and unreasonable. See Opinion No. 405, 76 FERC ¶ 61,021 (1996). The Commission began by repudiating the ALJ's highly critical view of two-part rates and SFV. First, "[a] reservation charge helps ration capacity, whether in the market area or in the production area." *Id.* at 61,060. Second, rebutting the ALJ's belief that a two-part rate with reserved capacity was an anticompetitive "tying" practice, it said there was nothing anticompetitive about putting shippers to a choice regarding whether or not to reserve capacity: "These are the types of choices that consumers are constantly required to make in a competitive marketplace." *Id.* Finally, any concerns regarding a tying effect once the choice to reserve was made were "tempered" by capacity holders' rights, established in Order No. 636, to release their capacity entitlements and thereby at least in part to offset the reservation costs. *Id.*

at 61,061. In fact, "this flexibility is enhanced on Transco's system by the right of firm shippers to release capacity in segments in order to tailor their capacity needs and alternatives to fit their needs." *Id.* Indeed, the Commission had little choice but to defend two-part SFV rates; as it acknowledges, they are the predominant method of pricing firm service in the wake of Order 636, Resp. Br. at 39, so a FERC repudiation would have risked regulatory upheaval.

But the Commission found a catch in Transco's proposal, the 1991 settlement:

> Transco proposes, in effect, to unilaterally modify those [1991] contracts so that the customer will pay a two-part rate for essentially the same firm service on the supply laterals. This is unacceptable. The customers must be given an opportunity to choose between firm or interruptible service.

Opinion No. 405, 76 FERC at 61,061. Thus the Commission offered its support for an "open season" where Transco's customers would be allowed to choose between firm and truly interruptible service (i.e., service that can and will be interrupted at times). *Id.* at 61,061–62.

Indicated Shippers petitioned for rehearing. On the contract abrogation argument, they argued that "[a] change from IT-feeders to FTW is a change in rate structure that changes the apportionment of costs, just as costs are shifted upon the adoption of a change in rate design or cost allocation method. Such a change does not constitute an abrogation of existing contracts." In other words, they said, Transco had proposed nothing different from the MFV–SFV shift that the Commission had routinely endorsed—had, indeed, imposed on parties by overriding contracts in the name of the public interest under *Mobile-Sierra.* The Commission, however, was resolute in defense of the prevailing rates. Transco had proposed "a fundamental change to the rate design, not a mere cost reallocation." Opinion No.

405–A, 77 FERC ¶ 61,270 at 62,127. "A cost reallocation will not change a one-part rate into a two-part rate; it will only change the level of existing charges." *Id.* Indicated Shippers petition for review.

\* \* \*

■ Under § 4 of the Natural Gas Act a pipeline proposing a rate change has the burden of showing that the proposed rate is just and reasonable. If it meets that burden, FERC approves the rate regardless of whether there may be other rates that would also be just and reasonable. See *Western Resources, Inc. v. FERC,* 9 F.3d 1568, 1578 (D.C.Cir.1993); *Public Serv. Comm'n v. FERC,* 866 F.2d 487, 488 (D.C.Cir.1989). The Commission is afforded a "narrow section 4 range of acceptance or disapproval of a pipeline's proposed changes." *Public Serv. Comm'n,* 866 F.2d at 491 (quoting *Sea Robin Pipeline Co. v. FERC,* 795 F.2d 182, 183 (D.C.Cir.1986)).

The Commission concedes that "two-part rates are permissible for firm service in the production area." Opinion No. 405, 76 FERC at 61,061; see also 18 CFR § 284.8(d). In fact, FERC informs us that such rates are "predominant" for firm service in the production area. Resp. Br. at 39. Thus a logical first question might be: is Transco's IT-feeder service "firm service" of the sort for which SFV rates are, in FERC's words, "permissible" and "predominant"?

FERC and the parties call the IT-feeder service "firm" or at least "essentially firm." The term "essentially firm" derives from the 1991 settlement, see Settlement Order, 55 FERC at 62,346, and FERC still agrees with that characterization. Opinion No. 405–A, 77 FERC at 62,129. The qualifier—"essentially"—appears to derive from certain grandfathered firm service that predated the 1991 settlement. See Settlement Order, 55 FERC at 62,345–46. The qualifier might also derive from the paradoxical characterization of ITfeeder service in the Settlement Order, that it is "not firm" but also not to be interrupted. See *id.* at 62,377. FERC at times returns

to this apparent doublespeak in Order No. 405, referring to "high priority, interruptible service." Order No. 405, 76 FERC at 61,061. In this proceeding, FERC has at no time rested its decision on any claim that the qualifier "essentially" is material. Accordingly, we treat the service as firm and the qualifier as immaterial, subject, of course, to the possibility that on remand the Commission may breathe life into the qualifier.

And so we reach the central issue: if two-part rates are permissible and predominant for firm service in the production area, and Transco is providing firm service in the production area, how can Transco's proposed rate not be just and reasonable? The Commission offers two bases: first, the contracts don't allow it, and second, "customers must be given an opportunity to choose between firm or interruptible service," what might be termed a "customer choice policy." Opinion No. 405, 76 FERC at 61,061.

### The Contracts

■ The Commission's reliance on the prior contracts seems not to advance the case at all. After the Supreme Court enunciated the *Mobile-Sierra* doctrine, it approved and gave effect to so-called "*Memphis* clauses," under which a pipeline by contract reserves the freedom to secure rate changes by standard filings with FERC such as those under § 4. See *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.,* 358 U.S. 103, 110–15, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); see also *Union Pacific Fuels, Inc. v. FERC,* 129 F.3d 157, 160 (D.C.Cir.1997). Before us the Indicated Shippers assert, and the Commission does not dispute, that the contracts contained *Memphis* clauses. With a *Memphis* clause, the contract contemplates and allows section 4 filings and any "just and reasonable" rates that result from such filings. Thus we are puzzled by the Commission's insistence, in the opinions under review and its brief here, that Transco's filing was inherently an "abroga-

tion" of the contracts. For example, the Commission states that Transco seeks to "unilaterally modify those contracts," Opinion No. 405, 76 FERC at 61,061, and that "Transco's proposed unilateral change results in an abrogation of the contracts," Opinion No. 405–A, 77 FERC at 62,127. See also Resp. Br. at 41–42.

But with a *Memphis* clause, where is the "abrogation"? At this point, one would suspect that part of FERC's theory of "abrogation" would be that the contracts gave rise to a *Mobile-Sierra* bar on two-part rates. Opinions No. 405 and No. 405–A certainly imply as much (although without discussing either *Mobile-Sierra* or *Memphis*). But FERC's brief disclaims the presence of a *Mobile-Sierra* bar. Resp. Br. at 42. Rather, FERC describes its analysis as merely "tak[ing] existing private contractual agreements into consideration," *id.* at 42–43, citing three cases that purportedly encourage such consideration, one of which is the *"Mobile"* of *Mobile-Sierra*. See *id.* at 43 (citing *Mobile,* 350 U.S. at 338–39, 76 S.Ct. 373; *Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1009 (D.C.Cir.1987); *Cities of Bethany v. FERC,* 727 F.2d 1131, 1139 (D.C.Cir.1984)).

*Associated Gas* and *Cities of Bethany* are not similar to the situation Transco presents; they involve inquiries as to whether rates reached by private contract are discriminatory. And the *Mobile* citation is inapt because the Commission rightly disclaims any *Mobile-Sierra* bar in the contract. Given the presence of *Memphis* clauses, observations from these three opinions regarding "Congress's intention in the NGA to allow a vital role for private contracting between parties," *Associated Gas,* 824 F.2d at 1009, provide no apparent basis for rejecting a proposal for rates that undeniably meet the "just and reasonable" standard.

Yet the Commission was ready to approve the rates under special circumstances; because the proposed change was too "fundamental," Opinion No. 405–A, 77 FERC at 62,127, Transco could apply it only after an open season. This position confirms that the Commission perceives no *Mobile-Sierra* bar. After such an open season, customers will either have firm service with a two-part rate or truly interruptible service with a purely volumetric rate; they will not have their original bargain.

And so we are left with something of a purple cow. According to the Commission, Transco sought an abrogation of the contracts by proposing a two-part rate, but the original one-part rate is not protected by a *Mobile-Sierra* bar. The Commission must explain this state of affairs because it seems to defy the doctrines built upon *Memphis* and *Mobile–Sierra.* Since Opinions No. 405 and No. 405–A do not discuss either of these cases, or their progeny, we safely conclude that there was inadequate explanation on this point.

### Customer Choice

Perhaps intertwined with the theory of contractual abrogation, the Commission concludes that as a matter of policy Transco's customers should get a choice as to whether they pay a reservation charge for their firm service. This policy is defended as something of a corollary of a policy that is part of the Commission's regulations: the choice between firm and interruptible service.

> An interstate pipeline that provides firm transportation service under subpart B and G of this part must also offer transportation service on an interruptible basis under that subpart or subparts and separately from any sales service.

18 CFR § 284.9(a)(1).

Back at the time of the settlement, Transco's customers made a choice between firm and interruptible service; they specifically asked FERC to guarantee them firm rights on the IT-feeders, and FERC did so. The customers also received (temporarily, because of the *Memphis* clause) something of a windfall—firm

service but without paying for their entitlement to capacity. Before these customers can be forced to pay for their firm service in the predominant manner (i.e., two-part rates), FERC says they must be given a new choice

> between purchasing a higher quality firm service with a reservation charge or purchasing a lower quality interruptible service without a reservation charge.

Opinion No. 405, 76 FERC at 61,060. See also Opinion No. 405–A, 77 FERC at 62,-124 n. 3 (speaking of the desirability of customer "choice of a higher quality firm service *with* a reservation fee and a lower quality interruptible service *without* a reservation fee" (emphasis added)).

For practical purposes, the choice between firm and interruptible service will usually entail a choice between two-part and one-part rates. Two-part rates predominate for firm service, and interruptible service has only a one-part rate. The choice made in Transco's settlement did not correspond to this model, but the Commission does not make a coherent case as to why the new choice is required, or why a two-part rate structure—not merely permissible but predominant for the service chosen—is unjust or unreasonable.

The Commission calls the imposition of a two-part rate a "fundamental" change in the rate structure, but a significant chunk of the Commission's opinion disclaims the criticism of reservation charges found in the ALJ opinion. See Opinion No. 405, 76 FERC at 61,060–61. The Commission does offer the terse conclusion that "[a] cost reallocation will not change a one-part rate into a two-part rate; it will only change the level of existing charges." Opinion No. 405–A, 77 FERC at 62,127. We are unsure why this should be relevant. The basic idea of a *Memphis* clause is to reserve to the utility the power to file

tariffs that can take effect if they pass Commission scrutiny under its ordinary standards: thus, if a filing under § 4 proposes rates that are just and reasonable, as these concededly are, they are to be accepted—regardless of the justness and reasonableness of the former rates.

FERC's resistance here is especially odd in light of its aggressiveness in shifting pipelines with two-part rates from MFV to SFV. If inclusion of a *few* fixed costs in the usage component of a two-part charge was so distortive of the market as to require the Commission's use of the *Mobile–Sierra* public interest standard to effect the MFV–SFV conversion, one would suppose a one-part charge for firm customers, with *all* fixed costs in a purely volumetric charge, would be similarly offensive. The Commission's opinions in this case do not explain why Order No. 636's principles are not at play here on the side of the Indicated Shippers.[1]

The policy embedded in the regulations is a choice between firm and interruptible service, and Transco's customers made that choice in 1991. They got firm service and a one-part rate; the pipeline got a *Memphis* clause. The Commission's new policy that Transco's customers get a second choice (framed as one between two packages, firm service with a reservation charge or interruptible service without) rests on some heretofore unspoken reason why a reservation charge for firm service—concededly just and reasonable—is not just and reasonable because the customers had previously been receiving firm service under a purely volumetric charge. The Commission's insistence that the change can be made only by an open season seems to amount to a belief that customers, having already elected firm service, must now be asked, "Firm service—is that your final answer?" Why this second

---

1. FERC's regulations provide that "[w]here the customer purchases firm service, a pipeline *may* impose a reservation fee or charge on a shipper as a condition for providing such service." 18 CFR § 284.8(d) (emphasis added). This regulation did not figure prominently in arguments on appeal. It certainly implies that reservation fees are not required with firm service; it expressly provides that they are permissible.

bite at the apple is needed remains a mystery.

\*     \*     \*

Because the Commission has failed to "cogently explain why it has exercised its discretion in [the] given manner," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); 5 U.S.C. § 706(2)(A), we reverse and remand the case for reconsideration in light of this opinion.

*So ordered.*

RANDOLPH, Circuit Judge, dissenting:

No party denies that Transco could exercise the *Memphis* clause and propose a rate change. But the Commission still had a statutory duty to ensure that the company's § 4 proposal was "just and reasonable." 15 U.S.C. § 717c. The Commission performed that duty and rejected Transco's filing because it did "not allow for a real choice of service options on Transco's supply laterals." 76 F.E.R.C. at 61,061. I believe the Commission offered a reasoned explanation for its decision.

The majority makes much of the Commission's mention of "abrogation of contracts," but then recognizes that this rationale is "perhaps intertwined" with the customer choice policy. Maj. op. at 52. Indeed, reference to the existing contracts was not an independent ground of the Commission's decision, but a necessary consequence of the customer choice policy. If two-part rates are just and reasonable only when customers have already elected a reservation charge, then the Commission must ask the simple question whether the customers have in fact chosen a reservation charge. The Commission indicated that it would allow a change in rates after an open season, which would alter the bargain in the original contract. *See id.* This demonstrates that the Commission was not nullifying the *Memphis* clause.

Thus, the real question is whether the Commission was arbitrary and capricious in rejecting Transco's proposal based on the customer choice policy. The Commission has rejected the idea of an outright ban on reservation charges, noting that such charges offer advantages to customers. *See* 76 F.E.R.C. at 61,059 (citing Order No. 436, 50 Fed.Reg. 42,408 (1985)). But the Commission also recognizes that reservation charges tie customers to the pipeline, creating an incentive to use the pipeline even if more efficient service can be obtained elsewhere. *See* 76 F.E.R.C. at 61,060. The Commission thus decided that it is best left to individual customers to "weigh whether the advantages of obtaining a firm right to service on the pipeline are worth the limits which the reservation charge will inevitably impose on the desirability of its switching to supplies on another system." *Id.* Because Transco's proposal denied conversion shippers an opportunity to make this cost-benefit analysis for themselves, the Commission rejected it.

The majority emphasizes that customers have already chosen firm service. *See* maj. op. at 53–54. But the question is not whether customers already elected "essentially firm" service. The question is whether they already elected two-part rates. It is uncontested that they did not. The majority also finds the Commission's decision "especially odd" because it supposedly conflicts with Order 636's principle against fixed costs in usage charges. *See id.* This takes Order 636 too far. The Commission there decided only that "[i]f a *reservation fee is charged*, it must recover all fixed costs attributable to the firm service ....." 18 C.F.R. § 248.8(d) (emphasis added). To find that fixed costs could never be included in usage charges would require doing away with interruptible service (which is necessarily a one-part rate), something the Commission certainly did not intend. According to the majority, the Commission rejected as unjust and unreasonable a two-part rate that is the "predominant manner" of "firm service." Maj.

 

op. at 53. This forgets that the predominant manner of service overall is to allow customers to choose whether to pay a reservation charge and receive firm service or to reject the reservation charge and receive lower priority service. Indeed, the majority does not cite a single case (in either § 4 or § 5 proceedings) in which the Commission approved two-part rates when customers had not previously made the calculation that reservation charges would be advantageous.

I therefore dissent.