**DUKE ENERGY TRADING AND MARKETING, L.L.C., and American Natural Gas Corporation, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

PG&E Gas Transmission, Northwest
Corporation, Intervenor.

No. 01–1163.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 2002.

Decided Jan. 21, 2003.

Gordon J. Smith argued the cause and filed the briefs for petitioner.

Laura J. Vallance, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor.

Lee A. Alexander, Stefan M. Krantz, and Debra H. Rednik were on the brief for intervenor. Carl M. Fink entered an appearance.

Before: SENTELLE, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Duke Energy Trading & Marketing, L.L.C. (Duke) and American Natural Gas Corporation (ANG) petition for review of a Federal Energy Regulatory Commission (FERC or the Commission) order accepting a tariff filing from PG&E Gas Transmission, Northwest Corporation (PG&E). *PG&E Gas Transmission, Northwest Corp.*, 93 F.E.R.C. ¶ 61,072, 2000 WL 1597087 (2000), *reh'g denied*, 94 F.E.R.C. ¶ 61,114, 2001 WL 112329 (2001). The order under review allows PG&E to eliminate its queue system for allocating interruptible transmission (IT) capacity among maximum rate bidders and to replace it with *pro rata* allocation. We find that FERC acted reasonably in accepting PG&E's filing and thus deny the petition for review.

## I. Background

PG&E operates a natural gas pipeline running 612 miles from the Washington/Canada border to the border between Oregon and California. On its pipeline, PG&E sells two primary types of natural gas transportation capacity–firm and interruptible. Firm capacity is purchased on a

monthly basis and cannot be interrupted or curtailed except in limited circumstances. Interruptible capacity can be interrupted when necessary to provide service to higher priority customers, such as firm customers. Interruptible capacity is bid for as needed, rather than purchased monthly. PG&E's gas tariff sets the maximum per-mile rates PG&E can charge for its interruptible transportation services. The total amount a shipper pays for service, and thus the revenue generated, is derived by multiplying the per-mile bid by the number of miles the gas is to be transported.

Prior to the proceedings under review, PG&E allocated IT capacity first to shippers bidding the maximum per-mile rate, regardless of distance, and hence regardless of revenue. PG&E then allocated any remaining capacity to shippers bidding less than the maximum per-mile tariff rate by ranking bids based on total revenue. Ties between bidders, at both the maximum and sub-maximum rates, were broken according to a shipper's position in the IT queue. Thus, if two shippers' bids were tied, the shipper with the higher position in the queue would be allocated the IT capacity. Queue positions were determined by a lottery held by PG&E in 1987. *See Pacific Gas Transmission Co.*, 40 F.E.R.C. ¶ 61,193, 1987 WL 117714 (1987). In that lottery, ANG won the highest position in the queue. Duke later acquired ANG.

On March 1, 2000, PG&E submitted a tariff filing pursuant to Section 4 of the Natural Gas Act, 15 U.S.C. § 717c (2000), seeking to change its IT capacity allocation method. PG&E proposed to use the system it employed to rank sub-maximum rate bidders to rank bids from maximum rate bidders as well. Under this "revenue-based" or "distance-based" proposal, allo-

cation would be determined by net revenue generated per dekatherm, with net revenue being determined by multiplying the distance in pipeline miles from the receipt point to the delivery point by the rate bid plus surcharges. Consequently, a long-haul maximum rate bidder would always defeat a shorter-haul maximum rate bidder, because the long-haul shipper's total bid would always generate greater revenue. If any ties remained between bids generating the same net revenue, capacity would be allocated *pro rata*—that is, each tied bidder would receive a proportionate share of the remaining capacity. In sum, under PG&E's filing, the IT queue would be replaced with revenue-based allocation followed by a *pro rata* tiebreaker.

On September 14, 2000, FERC rejected PG&E's proposal. *See PG&E Gas Transmission, Northwest Corp.*, 92 F.E.R.C. ¶ 61,202 (2000) (*PG&E I*). In *PG&E I*, FERC focused almost exclusively on its concern that extending revenue-based allocation to maximum rate bidders would unduly discriminate against short-haul shippers whose bids could never generate more revenue than longer-haul shippers.[1] *See id.* at 61,677. Even though FERC rejected PG&E's revenue-based allocation mechanism, the rejection was "without prejudice to PG&E[ ] making a new filing to modify its proposal to include an alternate allocation mechanism," *id.*, and FERC explicitly noted that it had "accepted other methods of allocating capacity when shippers all bid the maximum rate, such as *pro rata*," *id.* at 61,676.

Shortly thereafter, PG&E submitted a new tariff filing that replaced the queue with simple *pro rata* allocation among all maximum rate bidders. Under this proposal, each maximum rate bidder would receive a proportionate share of capacity

---

1. PG&E's appeal of this ruling is addressed in a companion case, *PG&E Gas Transmission,*

*Northwest Corp. v. FERC*, 315 F.3d 383 (D.C.Cir.2003), issued by this Court today.

regardless of revenue generated by its total bid. Petitioners lodged a protest arguing that PG&E's new proposal was identical to the filing rejected in *PG&E I* because both proposals contained an element of *pro rata* allocation and resulted in elimination of the IT queue. Petitioners also contended that continued use of the IT queue would promote FERC's efficiency goals better than *pro rata* allocation.

On October 25, 2000, FERC approved PG&E's filing over petitioners' protest, rejecting petitioners' argument that PG&E's filing was identical to the filing in *PG&E I*. *PG&E Gas Transmission, Northwest Corp.*, 93 F.E.R.C. ¶ 61,072, at 61,187, 2000 WL 1597087 (2000) (*PG&E II*). In addition, FERC reasoned that *pro rata* allocation would eliminate the need for a complex queue and improve efficiency along the pipeline by allocating capacity based on willingness to pay rather than queue position. *Id.* Finally, FERC relied on its own precedent finding the *pro rata* method to be a just and reasonable means of allocating interruptible capacity among tied bidders. *Id.*

FERC denied petitioners' request for rehearing, *PG&E Gas Transmission, Northwest Corp.*, 94 F.E.R.C. ¶ 61,114, 2001 WL 112329 (2001) (Rehearing Order), and petitioners timely sought judicial review.

## II. Analysis

■ Under Section 4 of the Natural Gas Act, 15 U.S.C. § 717c, a pipeline proposing a rate change has the burden of showing that the proposed rate is just and reasonable. *Exxon Corp. v. FERC*, 206 F.3d 47, 51 (D.C.Cir.2000). "If it meets that burden, FERC approves the rate regardless of whether there may be other rates that would also be just and reasonable." *Id.* We will uphold FERC's decision to approve a tariff filing unless it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). Under this deferential standard, "the Commission must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *Northern States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C.Cir.1994) (quotation omitted).

Petitioners attack FERC's ruling on two grounds. First, petitioners claim that FERC arbitrarily and capriciously approved the *pro rata* mechanism in *PG&E II* after rejecting what petitioners describe as an "identical" proposal in *PG&E I*. Second, petitioners contend that FERC's acceptance of the *pro rata* mechanism as "just and reasonable" was arbitrary and capricious and unsupported by substantial evidence. We find neither argument persuasive.

### A.

Describing PG&E's second proposed tariff as "simply a 'rerun' of the same filing" that PG&E had previously made, and the Commission rejected, petitioners assert that the new filing "should have been summarily rejected under collateral estoppel principles," and the Commission's acceptance of it was arbitrary and capricious. Pet. Br. at 12. This argument fails utterly. Petitioners' contention that the *pro rata* mechanism at issue here is identical to the one FERC rejected in *PG&E I* is meritless. As FERC correctly found, the present proposal "no longer seeks to prioritize maximum rate bids based upon a distance-based allocation mechanism." *PG&E II*, 93 F.E.R.C. at 61,187. Rather, PG&E "solely proposes to implement a tiebreaking procedure for maximum bids strictly on a *pro rata* basis." *Id.* The most superficial analysis demonstrates that FERC correctly found the instant proposal to be entirely different than the

revenue-based mechanism followed by a *pro rata* tiebreaker it rejected in *PG&E I*. The two proposals operate differently and produce vastly different results. For example, envision two shippers each bidding the maximum per-mile rate. Shipper A bids for 100 miles of transportation, while Shipper B bids for 200 miles. Under PG&E's first proposal, Shipper B would always receive IT capacity over Shipper A because his bid would generate greater revenue. Under the present *pro rata* proposal, by contrast, each shipper would receive a proportionate allocation of capacity.

That the proposals both contain a *pro rata* component is not determinative. The *pro rata* device plays a substantially different role in the two proposals. Under the *PG&E I* filing, the *pro rata* tiebreaker was to be applied only after the revenue mechanism was used to rank bidders on the basis of distance and hence revenue. That is, *pro rata* allocation served only in a secondary capacity after application of the revenue mechanism had failed to resolve all allocation issues. Under the instant proposal, *pro rata* allocation is the sole means for allocating capacity among maximum rate bidders, and thus performs a much more fundamental and important role. Just as importantly, total revenue plays no role in allocating capacity among maximum rate bidders in the instant proposal, thereby eliminating FERC's *PG&E I* concern about discrimination against short-haul shippers. To suggest that two separate tariffs are identical, and that the rejection of one mandates the rejection of the other, simply because they contain a common element makes no sense. As there are a limited number of factors that pipelines can conceivably rely upon to set tariffs, petitioners' approach would virtually lock the pipelines and the Commission into a perpetual rate once the first attempt at change has failed, no matter how just and reasonable some subsequent submission might be.

Petitioners also apply the same sort of faulty reasoning to a different element of the approved tariff by contending that because FERC in *PG&E I* rejected one proposal to eliminate the IT queue, FERC could not approve any subsequent proposal that eliminated the queue. This is nonsense. The fact that FERC rejected one rate proposal including elimination of the queue cannot conceivably preclude it from accepting a later "just and reasonable" proposal merely because the new proposal also eliminates the queue. FERC's order in *PG&E I* offers no support for petitioners' argument. First, nothing in *PG&E I* suggests that FERC found any inherent defect in eliminating the queue. Rather, FERC's opinion focused on the shortfalls of the revenue-based mechanism as a primary allocator of capacity, rejecting it because it would result in discrimination against short-haul shippers. *See PG&E I*, 92 F.E.R.C. at 61,677. That is, the Commission rejected only PG&E's proposed replacement for the queue; it did not hold or even suggest that there could never be any valid replacement. Moreover, the Commission never addressed the validity of the *pro rata* portion of the proposal, much less the validity of a *pro rata* mechanism acting alone to allocate capacity, as is proposed here. To the contrary, FERC "reject[ed] PG&E[ ]'s capacity allocation proposal without prejudice to PG&E[ ] making a new filing to modify its proposal to include an alternate allocation mechanism." *Id.* Far from barring future filings to eliminate the queue, FERC explicitly noted that it "has accepted other methods of allocating capacity when shippers all bid the maximum rate, such as pro rata." *Id.* at 61,676. Thus, the Commission's order implicitly, if not explicitly, invited PG&E to propose *pro rata* allocation of IT capacity among maximum rate bidders. It certainly did not preclude future proposals to eliminate the queue.

Consequently, we reject petitioners' claim that the ruling under review is inconsistent with FERC's order in *PG&E I*.

### B.

Petitioners' second argument is as meritless as their first. They contend that FERC's conclusion that PG&E's *pro rata* proposal is "just and reasonable" under Section 4 of the Natural Gas Act is arbitrary and capricious, as there was before the Commission no substantial evidence that *pro rata* allocation would be more efficient than the use of the queue. They further argue that FERC ignored its own precedents finding queues to be just and reasonable and instead "cherrypicked" precedents finding *pro rata* applications to be just and reasonable. None of this undermines the validity of the Commission's decision.

■ Petitioners' arguments rest on a fundamental misunderstanding of the inquiry under Section 4 of the Natural Gas Act. Under Section 4, a pipeline seeking to change its existing tariff need not demonstrate that the existing tariff, in this case the queue, is unjust and unreasonable. *Mun. Def. Group v. FERC*, 170 F.3d 197, 201 (D.C.Cir.1999) ("§ 4 applied and the Commission was not required to establish that [the pipeline's] prior allocation method was unjust or unreasonable."). Rather, the Commission need only find that the proposed tariff is just and reasonable. *Exxon Corp.*, 206 F.3d at 51. Nothing in Section 4 requires the pipeline to prove that its proposal is more just and reasonable than the existing system. The pipeline must only show that its proposal is just and reasonable in its own right. In this case, then, FERC had no obligation to find that the IT queue was no longer functioning well, nor even to find that *pro rata* allocation is more efficient than the IT queue. As petitioners correctly conceded at oral argument, there may be a number

of different potential rates all of which are just and reasonable. Thus, FERC needed only to find *pro rata* allocation to be just and reasonable.

In finding PG&E's *pro rata* allocation proposal just and reasonable FERC cited four cases in which "[t]he Commission has ruled ... that the *pro rata* methodology for breaking ties for interruptible service is just and reasonable under Section 4 of the Natural Gas Act." *PG&E II*, 93 F.E.R.C. at 61,187 & n. 6. Specifically, FERC relied on *Northern Border Pipeline Co.*, 69 F.E.R.C. ¶ 61,114, 1994 WL 595563 (1994), *reh'g denied*, 70 F.E.R.C. ¶ 61,034, 1995 WL 17739 (1995), a case with similar facts to this one in which FERC approved elimination of a queue in favor of *pro rata* allocation among tied bidders. *PG&E II* 93 F.E.R.C. at 61,187.

Petitioners do not dispute that these cases establish the validity of the *pro rata* mechanism. *See* Pet. Br. at 24 ("the Commission has clearly determined that either queue or *pro rata* tiebreakers are equally consistent with Commission policy"). Nor do petitioners submit any reason why we should attempt to limit the Commission's application of its own precedent. Rather, petitioners argue that FERC should have rejected the *pro rata* proposal by relying on precedent finding queues to be just and reasonable. As explained above, petitioners' argument is a *non sequitur*. Under Section 4, the fact that PG&E's queue was just and reasonable under FERC precedent does not preclude FERC from accepting *pro rata* allocation as just and reasonable as well. Therefore, we hold that the Commission did not "cherry-pick" favorable precedent, as petitioners claim, but instead reasonably followed the consistent rulings of the Commission finding *pro rata* tiebreakers to be just and reasonable.

We would be remiss if we did not note one complicating factor. We have today

issued the opinion in a companion case, *PG&E Gas Transmission v. FERC*, 315 F.3d 383, granting PG&E's petition for review of the FERC decision in *PG&E I*. We recognize the very real possibility that Commission proceedings on remand may result in the displacement of the tariff approved in *PG&E II*, which we review in this proceeding. We wish to make it plain that we do not intend this opinion to bar any party from litigation of any issue not decided herein. We decide only those issues raised in this petition, in the anticipation that the approved tariff which we review herein will continue in effect unless and until displaced by some other tariff in further appropriate proceedings.

## III. Conclusion

We hold that FERC was not precluded from approving PG&E's *pro rata* allocation mechanism by its rejection of an earlier filing proposing revenue-based allocation followed by a *pro rata* tiebreaker. On the merits, we hold that FERC adequately supported its conclusion that PG&E's proposal to allocate IT capacity *pro rata* among maximum rate bidders is "just and reasonable" under Section 4 of the Natural Gas Act. Accordingly, the petition for review is

*Denied.*

