**EXXON MOBIL CORPORATION,
et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

Consolidated Edison Company of New
York, Inc., et al., Intervenors

Nos. 01–1407 and 01–1415.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 9, 2002.

Decided Jan. 17, 2003.

Thomas J. Eastment argued the cause for petitioners Exxon Mobil Corporation, et al. With him on the briefs were Douglas W. Rasch, Bruce A. Connell, Joseph E. Mixon and Charles J. McClees, Jr. Linda L. Geoghegan entered an appearance.

Gregory Grady argued the cause for petitioner Transcontinental Gas Pipe Line Corporation. With him on the briefs were Michael J. Thompson and David A. Glenn.

Timm L. Abendroth, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor.

Kenneth T. Maloney argued the cause for intervenors KeySpan, et al. With him

on the brief were James H. Byrd and Steven J. Kalish. Edward B. Myers entered an appearance.

Before: GINSBURG, Chief Judge, and ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Transcontinental Gas Pipe Line Corporation has tried for nearly ten years to convince the Federal Energy Regulatory Commission to allow it to adopt a pricing system called "firm to the wellhead" that many of its competitors employ. In this case, Transco and a group of natural gas producers that use its pipeline petition for review of FERC's latest rejection of Transco's firm transportation proposals. Because the Commission failed to reconcile its decision here with an earlier opinion on a related matter, we grant the petition and remand for further proceedings.

## I.

Like so much of this circuit's FERC business, this case has its roots in the Commission's 1992 restructuring of the natural gas industry under its landmark Order No. 636 to create a "national gas market" with "head-to-head, gas-on-gas competition." *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* [Regs. Preambles 1991–1996] FERC Stats. & Regs. (CCH) ¶ 30,939, at 30,434 (1992), *on reh'g,* Order No. 636–A, [Regs. Preambles 1991–1996] FERC Stats. & Regs. (CCH) ¶ 30,950 (1992), *on reh'g,* Order No. 636–B, 61 F.E.R.C. ¶ 61,272, 1992 WL 509683 (1992), *reh'g denied,* 62 F.E.R.C. ¶ 61,007, 1993 WL 27838 (1993), *aff'd in part, United Distrib. Cos. v. FERC,* 88 F.3d 1105 (D.C.Cir.1996). Order No. 636 made three changes relevant

here. First, it required interstate pipelines to provide local gas distributors that had contracts to purchase gas in downstream areas an opportunity to convert those entitlements into rights to "firm transportation" (FT) service that could be used to deliver gas purchased from a variety of producers upstream. Second, the order changed traditional FT pricing—which requires customers to pay both a reservation charge to preserve their priority capacity and a separate usage charge based on volumes actually shipped—by mandating that pipelines allocate all fixed costs to the reservation charge. According to FERC, this "straight fixed variable" system would make pricing more transparent. Finally, because most pipelines base their rates on a zone system, Order No. 636 increased transportation flexibility by requiring that where FT customers pay reservation charges to secure capacity in any part of a zone, they must be given secondary rights to receive or deliver gas at other points within that zone, even if the locations are not specified in their contracts.

Most interstate pipelines responded to Order No. 636 by offering their converting customers rights to firm transportation from producers' gathering facilities downstream to the delivery points specified in the customers' contracts. This is called "firm-to-the-wellhead" (FTW) service, although technically it does not extend to individual wellheads.

Transco chose not to adopt FTW service when it voluntarily unbundled its sales and transportation service about a year before Order No. 636 was issued. The company, which operates a pipeline running northeast from the Gulf of Mexico to New York City, carried unbundling one step further by breaking its transportation service into two distinct components. First, Transco's 1991 settlements with its local gas distribu-

tors, known as "FT conversion shippers," gave the shippers firm transportation rights from "pooling points" at certain compressor stations on Transco's main pipeline downstream to their designated delivery points. Second, the agreements left service above the pooling points and on supply laterals to be contracted for separately under Transco's "interruptible transportation" (IT) service tariff. Subject to a one-part volumetric price that includes both variable and fixed costs, IT service must give way to higher priority deliveries. Because the FT conversion shippers and FERC were concerned about potential upstream disruptions, however, Transco specified that "IT feeder" shipments for delivery to FT conversion shippers would have higher priority than normal IT transmissions. *Transcontinental Gas Pipe Line Corp.*, 55 F.E.R.C. ¶ 61,446, 1991 WL 519696 (1991), *on reh'g*, 57 F.E.R.C. ¶ 61,345, 1991 WL 319877 (1991), *on reh'g*, 59 F.E.R.C. ¶ 61,279, 1992 WL 122152 (1992), *aff'd in part and remanded sub nom. Elizabethtown Gas Co. v. FERC*, 10 F.3d 866 (D.C.Cir.1993).

Although the parties appear to have assumed during the negotiations that FT conversion shippers would contract separately with Transco for IT feeder service, the settlement agreements did not actually require them to do so. In practice, producers such as Petitioners Exxon and the other so-called Indicated Shippers have contracted with Transco for IT feeder service to move their supplies to the pooling points. Thus, while local gas distributors pay nearly all fixed costs on competitor pipelines under FTW pricing systems, producers linked to Transco pay about $50 million per year in fixed costs under Transco's IT feeder rates. By raising their commodity prices downstream, producers could pass those costs onto FT conversion shippers and other local gas distributors, but Transco and the Indicated Shippers assert that they are often forced to absorb

the expense instead to ensure that their prices appear competitive with producers on other pipelines. According to Transco, this puts it at a competitive disadvantage and, over the long term, may prompt producers to avoid connecting to its pipeline.

FERC, however, has repeatedly rejected Transco's attempts to adopt FTW pricing. In 1993, it ruled that Order No. 636 did not require FTW pricing and declined to exercise its authority under section 5 of the Natural Gas Act (NGA), 15 U.S.C. § 717d, to mandate such service. *Transcontinental Gas Pipe Line Corp.*, 63 F.E.R.C. ¶ 61,194, 1993 WL 242130 (1993), *on reh'g*, 65 F.E.R.C. ¶ 61,023, 1993 WL 534383 (1993). Transco then proposed a change to its tariff under NGA section 4, 15 U.S.C. § 717c, that would eliminate IT feeder service, give FT conversion shippers secondary rights to service on supply laterals, and increase their rates to cover the additional $50 million in fixed costs that had previously been paid by producers ("FTW proposal"). The Commission rejected this plan as well, concluding that it would abrogate the conversion shippers' existing contracts and have anticompetitive effects. *Transcontinental Gas Pipe Line Corp.*, 72 F.E.R.C. ¶ 63,003, 1995 WL 425100 (1995), *modified* 76 F.E.R.C. ¶ 61,021, 1996 WL 383446 (1996), *on reh'g*, 77 F.E.R.C. ¶ 61,270, 1996 WL 862627 (1996), *on reh'g*, 79 F.E.R.C. ¶ 61,205, 1997 WL 267011 (1997). The Indicated Shippers filed a petition for review of that decision before this court.

While that petition was pending, FERC rejected still another Transco proposal to replace IT feeder service with new contracts for "firm transportation-supply lateral" service to be offered to FT conversion shippers and other interested parties ("FTSL proposal"). Although the Commission found that change forbidden by neither the 1991 settlements nor the FT

conversion shippers' firm service contracts, *Transcontinental Gas Pipe Line Corp.*, 85 F.E.R.C. ¶ 61,357, 1998 WL 878036 (1998), *reh'g denied*, 88 F.E.R.C. ¶ 61,135, 1999 WL 553854 (1999), it concluded that Transco's proposed terms would violate FERC's flexible receipt and delivery point policy under Order No. 636, *Transcontinental Gas Pipe Line Corp.*, 86 F.E.R.C. ¶ 61,175, 1999 WL 93668 (1999), *reh'g denied*, 88 F.E.R.C. ¶ 61,135, 1999 WL 553854 (1999). Shortly thereafter, we acted on the Indicated Shippers' petition for review and remanded the Commission's FTW decision for further explanation. *Exxon Corp. v. FERC*, 206 F.3d 47, 52–54 (D.C.Cir.2000).

■ On remand, in the order at issue in this case, FERC again rejected Transco's FTW proposal. *Transcontinental Gas Pipe Line Corp.*, 95 F.E.R.C. ¶ 61,322 (2001), *on reh'g*, 96 F.E.R.C. ¶ 61,142, 2001 WL 849816 (2001). This time the Commission focused on two facts: that the 1991 settlements and the conversion shippers' FT contracts gave them service rights only on Transco's main pipeline and that conversion shippers had chosen not to contract separately with Transco for IT feeder service. Although their agreements contain so-called *Memphis* clauses that authorize Transco to make unilateral changes in rates, terms, and conditions of conversion shippers' firm service, *see United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), the Commission concluded that the proposed change exceeded the scope of those clauses because it would force the conversion shippers to take capacity for which they had not contracted and then increase their rates accordingly. After rejecting Transco's proposal under NGA section 4 as not "just and reasonable," FERC again rejected the Indicated Shippers' argument that it should have exercised its NGA section 5 authority to require Transco to use the two-part, straight fixed variable pricing structure

favored in Order No. 636 throughout its entire pipeline.

Transco now petitions for review of the Commission's section 4 decision, while Exxon and the other Indicated Shippers challenge both the section 4 and section 5 rulings. A group of FT conversion shippers intervenes in support of FERC's decision.

**II.**

■ Under NGA section 4(e), interstate pipelines bear the burden of proving that proposed rate changes are just, reasonable, and not unduly discriminatory. 15 U.S.C. § 717c(a), (d), (e). If a pipeline carries this burden, the Commission must approve the change even if other rates would also be just and reasonable. *Western Resources, Inc. v. FERC*, 9 F.3d 1568, 1578–79 (D.C.Cir.1993). Although our review of FERC decisions under the Administrative Procedure Act is quite deferential, *see* 5 U.S.C. § 706(2)(C), we must reverse a decision that departs from established precedent without a reasoned explanation. *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C.Cir.1995).

■ Because the Commission has already ruled that FTW service using two-part, straight fixed variable rates is generally permissible, *see, e.g., Tex. E. Transmission Corp.*, 62 F.E.R.C. ¶ 61,015, at 61,094, 1993 WL 268345 (1993); *Transcontinental Gas Pipe Line Corp.*, 76 F.E.R.C. ¶ 61,021, at 61,060, the validity of FERC's decision here hinges upon whether Transco's particular FTW proposal would involve a contract modification not authorized by the *Memphis* clauses contained in the 1991 settlement agreements and the conversion shippers' existing firm service contracts. *See Memphis Light, Gas & Water Div.*, 358 U.S. at 110–13, 79 S.Ct. at 198–200; *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 343,

76 S.Ct. 373, 380, 100 L.Ed. 373 (1956). At first glance, the Commission's conclusions that Transco's proposal would force conversion shippers to accept and pay for capacity in excess of their current contractual obligations and that such a change exceeds the scope of the *Memphis* clauses seem perfectly reasonable. Although the Commission ruled in the FTSL case that the 1991 settlements and the conversion shippers' firm service agreements did not prohibit Transco from replacing IT feeder service with some other rate structure, that case involved a proposal to create a new set of voluntary contracts rather than, as here, an attempt to force supply lateral service on conversion shippers involuntarily under their existing FT contracts. *Transcontinental Gas Pipe Line Corp.*, 85 F.E.R.C. at 62,388–91. Petitioners, moreover, point to no case in which a *Memphis* clause has been used to force a pipeline customer to take additional service rather than to accept changes in the rates, terms, or conditions of service already agreed upon. Indeed, before the Commission, petitioners conceded that requiring customers to accept greater volumes of gas deliveries than called for in their service contracts would not be authorized by a normal *Memphis* clause. *Transcontinental Gas Pipe Line Corp.*, 95 F.E.R.C. at 62,139–40.

There is, however, a serious glitch: The Commission failed to reconcile its decision at issue here with its previous opinions concerning the complex ways in which the 1991 settlements and firm service agreements, Transco's FT tariff, and the Commission's own flexible delivery and receipt point policy interact with each other to shape the FT conversion shippers' rights to service.

In this case, FERC's characterization of Transco's FTW proposal as a contract modification rests largely on a 1995 opinion in which the Commission found that Transco's FT conversion shippers have no rights to service on supply laterals unless they contract separately for IT feeder service. Although FERC's flexible receipt point policy would normally provide secondary rights to service at all points within any zone in which an FT shipper pays reservation charges, the Commission concluded that Transco FT shippers have secondary rights only on the main pipeline because "[i]n the production area, the reservation charge is for service on the mainline facilities. A shipper pays a separate IT rate for service on supply laterals (IT–Feeders)." *Transcontinental Gas Pipe Line Corp.*, 73 F.E.R.C. ¶ 61,361, at 62,128, 1995 WL 754726 (1995). Applying that ruling to this case, the Commission reasoned that because the FT conversion shippers have in fact chosen not to contract for IT feeder service, forcing supply lateral service on them would modify their FT contracts in a way unauthorized by their *Memphis* clauses.

Disagreeing, petitioners point out that the Commission stated in its 1999 opinion rejecting the FTSL proposal that its flexible receipt point policy would automatically give Transco's FT customers secondary rights on supply laterals—apparently without modifying their service contracts—if Transco eliminated its IT feeder service. According to the opinion, the only reason that Transco's FT customers did not already have such rights as a benefit of paying zone reservation charges was that FERC had "made an exception to its general receipt and delivery point policy, because the IT–Feeder service itself provided shippers with the flexibility to access receipt and delivery points throughout the production area." *Transcontinental Gas Pipe Line Corp.*, 86 F.E.R.C. at 61,609. If Transco eliminated the IT feeder service, however, there would no longer be "any basis for permitting Transco to deny shippers the receipt and delivery point flexibil-

ity attendant to firm service," *id.,* despite Transco's protests that its firm zone rates did not include the costs allocated to service on the production area laterals. The Commission stated that any cost allocation problems could be fixed by adjusting zone reservation charges in a separate filing and did not change the basic rule that shippers paying a reservation rate for capacity within a particular zone are entitled to access at any point within that zone on a secondary basis. *Id.* at 61,610–11. Applying the same logic to this case, petitioners argue that no contract modification is necessary to give the FT conversion shippers rights on the supply laterals since they will gain such rights automatically under the Commission's general policies and Transco's proposed tariff modifications and that Transco is entitled to adjust its zone reservation charges accordingly.

The Commission may be able to reconcile the 1995 and 1999 decisions, but its efforts so far have only added to the confusion. When petitioners pointed out the conflict, the Commission flatly denied that the conversion shippers' current lack of supply lateral rights is "the result of any exemption from any Commission policy" without acknowledging the directly contradictory language in its 1999 decision. *Transcontinental Gas Pipe Line Corp.,* 96 F.E.R.C. at 61,609. Instead, the Commission simply dismissed that case, saying only that "adoption of FTW rates might also have an effect on flexible receipt and delivery points in Transco's production area, but that is a separate issue" from Transco's proposal forcing the conversion shippers to accept additional capacity in abrogation of their original contracts. *Id.* at 61,610. In our view, this explanation falls short because the 1999 opinion seems to indicate that the Commission's general policy would give FT conversion shippers secondary rights on the supply laterals without the need for a contract modification. *See also Regulation of Short–Term*

*Natural Gas Transportation Services, and Regulation of Interstate Natural Gas Transportation Services,* 101 F.E.R.C. ¶ 61,127 (2002) (rejecting an argument that Commission policies that increase firm shippers' secondary rights modify individual service agreements).

Because FERC failed to explain its conclusions here in light of its previous decisions, we remand the case for reconsideration consistent with this opinion. Given Transco's assurance at oral argument that it will immediately implement its FTW proposal if the Commission approves the rate change under section 4, we think it unnecessary to address the Indicated Shippers' section 5 arguments. *See Exxon Corp.,* 206 F.3d at 48–49.

*So ordered.*