# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 16, 2005  Decided December 6, 2005

No. 04-1226

EXXON MOBIL CORPORATION, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PIEDMONT NATURAL GAS COMPANY, INC., ET AL.,
INTERVENORS

———

Consolidated with
04-1228

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Thomas J. Eastment* argued the cause for petitioners Exxon Mobil Corporation, et al. With him on the briefs were *Melissa E. Maxwell*, *Douglas W. Rasch*, *Bruce A. Connell*, and *Charles J. McClees*.

*David A. Glenn*, *Gregory Grady*, and *Michael J. Thompson* were on the brief for petitioner Transcontinental Gas Pipe Line Corporation.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Cynthia A. Marlette*, General Counsel.

*James H. Byrd*, *Kenneth T. Maloney*, *Christopher M. Heywood*, and *Anne K. Kyzmir* were on the brief of intervenors The Brooklyn Union Gas Company, et al.

Before: GINSBURG, *Chief Judge*, and BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: For the third time before this court, Transcontinental Gas Pipe Line Corporation (Transco) challenges the decision by the Federal Energy Regulatory Commission (FERC) to deny Transco's proposal for implementing a "firm to the wellhead" (FTW) rate structure on its natural gas pipeline.[1] When we remanded this case for a second time, we

---

[1] Generating a dozen orders from FERC and now a third opinion from this court, Transco's struggle to change its rate structure has demonstrated the Dickensian potential of energy regulation disputes:

> This scarecrow of a suit has, in course of time, become so complicated, that no man alive knows what it means. The parties to it understand it least; but it has been observed that no two Chancery lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause; innumerable young people have married into it; innumerable

instructed FERC to reconcile two arguably inconsistent orders issued in response to Transco's rate structure proposals. While FERC's new variations on its theme have not rendered this already convoluted proceeding any less opaque (perhaps an understandable result of multiple remands), a consistent principle can still be discerned: prices may be increased, terms may be altered, but contracts may not be unilaterally amended to effectively add new service. Accordingly, we hold FERC did not act arbitrarily and capriciously in its previous orders. We therefore deny the petitions for review.

## I

Transco operates a natural gas pipeline that stretches northeastward from production areas in the Gulf of Mexico, terminating in the New York City area. The pipeline is divided into six zones, three in the "upstream" production area near the Gulf coast and three in the "downstream" market area. In the production area zones, the pipeline system consists of both "supply lateral" lines and a mainline; the supply laterals transport gas from the gathering areas to the mainline, where the gas is collected at pooling points. Until the 1980s, Transco and other pipeline companies acted primarily as gas merchants, transporting their own gas and selling it to distributors. Beginning in 1985, pipelines were required to start offering customers the ability to transform their entitlements to sales of gas into transportation-only service; this allowed the customers to purchase gas from the pipelines' competitors while still being able to transport it. Order No. 636, issued by FERC in 1992, completed this process by requiring pipelines to unbundle transportation service from sales of gas; customers would have

---

old people have died out of it.

Charles Dickens, Bleak House 6 (Modern Library 2002) (1853).

equal access to "firm transportation" (FT) service (that is, guaranteed capacity) regardless of whether they purchased gas from the pipeline or another company, a change intended to foster competition in the industry. Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. 13,267, 13,270 (Apr. 16, 1992) ("Order No. 636"), *on reh'g*, 57 Fed. Reg. 36,128 (Aug. 12, 1992) ("Order No. 636-A"), *on reh'g*, 61 F.E.R.C. ¶ 61,272 (1992), *reh'g denied*, 62 F.E.R.C. ¶ 61,007 (1993), *aff'd in part*, *United Distrib. Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996).

Order No. 636 also required companies to use a "straight fixed variable" pricing system for FT service. *Id.* at 13,293. Under such a system, pipeline companies would charge a two-part rate: an initial reservation charge (to guarantee that capacity would be available), plus a usage charge based on the volume of gas actually transported. *See* 18 C.F.R. § 284.7. In an effort to increase competition and improve transparency in pricing, FERC required pipelines to recover the "fixed costs" of FT service through the reservation charge rather than through the volumetric charge. Order No. 636 at 13,293.

Finally, Order No. 636 implemented a flexible receipt and delivery point policy under which any customer who paid a reservation charge for shipping gas within a zone had to be granted "secondary" rights to deliver or receive gas at points in that zone other than the "primary" points specified in the customer's contract. *Id.* at 13,290. When a customer used these secondary rights, shipping capacity would not be guaranteed; the rights would carry a lower scheduling priority than FT service purchased by customers with primary rights at the same points. Order No. 636-A at 36,148. At the same time, the secondary rights would have higher scheduling priority than a third

category of service, "interruptible transportation" (IT) service, which does not entitle a customer to any guaranteed capacity. Order No. 636 at 13,290. As higher priority service can take precedence over IT service, no reservation charge applies to IT service; hence, a one-part rate based on the volume of gas actually transported by the customer is charged for IT service. 18 C.F.R. § 284.9.

Most pipeline companies responded to Order No. 636 by offering "firm to the wellhead" (FTW) service, charging their customers two-part rates for transporting gas on both the supply laterals and the mainline. Transco, however, had already unbundled its service a year earlier, in 1991, through settlement agreements with its customers. *Transcon. Gas Pipe Line Corp.*, 55 F.E.R.C. ¶ 61,446 (1991), *on reh'g*, 57 F.E.R.C. ¶ 61,345 (1991), *on reh'g*, 59 F.E.R.C. ¶ 61,279 (1992), *aff'd in part*, *Elizabethtown Gas Co. v. FERC*, 10 F.3d 866 (D.C. Cir. 1993), *on remand*, 72 F.E.R.C. ¶ 61,037 (1995), *reh'g denied,* 73 F.E.R.C. ¶ 61,357 (1995). Pursuant to these settlements, Transco charges two-part FT rates for transporting gas on the mainline; customers who switched to this service were termed "FT-conversion shippers." On the supply laterals, though, Transco adopted an IT rate structure, charging a one-part rate based on the volume actually transported (with no separate reservation charge). Transco does not sell any FT service on the supply laterals.[2] When IT shippers deliver gas to FT-conversion shippers at receipt points on the mainline, their service on the laterals is given a higher priority ("IT-Feeder" priority) than regular IT service.

---

[2] Transco had sold FT service in the production areas to a few customers prior to offering open access to its transportation services. While these older service agreements were "grandfathered" through the settlements—i.e., those customers would have priority over IT shippers—they are essentially irrelevant to the current issues.

In calculating the reservation charge FT-conversion shippers have to pay for service in a zone, Transco divides the fixed costs to be recovered (i.e., those fixed costs allocated to that zone) by the total amount of transportation service projected for that zone, including both FT and IT service. The resulting figure determines both the per-unit reservation charge for FT service and the one-part, per-unit charge for IT-service.[3] Thus, the more IT service shippers demand in a zone, the lower an FT shipper's reservation charge will be for that zone.

For reasons that have never been made clear, Transco's IT-Feeder service was not purchased by the FT-conversion shippers but rather by natural gas suppliers (including the petitioners, "Indicated Shippers") who used the service to transport their gas to the pooling points on the mainline.[4] Once the gas arrived at the mainline, it would be transported by the FT shippers who purchased the gas from the producers. Eventually, Indicated Shippers became dissatisfied with this arrangement. They had to pay approximately $50 million per year in transportation costs on the supply laterals; producers who used other pipelines did

---

[3] The IT rates are calculated according to a "100 percent load factor" rate. Under such a calculation, the maximum rate for transporting one unit of gas via IT service is equivalent to the per-unit cost incurred by an FT shipper that uses its entire contract entitlement (and thus pays not only a reservation charge but also an FT per-unit charge for the entire capacity that it reserved).

[4] During oral argument, Indicated Shippers contended that they purchased the IT-Feeder service because it was, at the time, "the only game in town"; there was no competitive disadvantage in purchasing such service until other pipelines began selling FTW service. The lack of a competitive disadvantage still begs the question why the Indicated Shippers, rather than the FT-conversion shippers, decided that it would be in their interest to contract for transportation service on the laterals.

not incur this expense, as their customers subscribed to FTW service that included transportation on both the supply laterals and the mainlines. Still, the Indicated Shippers believed they could not always pass these costs on to their customers, as they needed to make their rates appear competitive with rates charged by producers serving other pipelines.

## II

Section 4 of the Natural Gas Act (NGA) governs rates and charges set by natural gas companies for the transportation or sale of gas; such rates and charges must be "just and reasonable" to be lawful. 15 U.S.C. § 717c(a). Changes to rates and charges can only be made after giving FERC notice so that it can hold a hearing on the legality of the change, if necessary. 15 U.S.C. § 717c(d)-(e). In 1995, Transco proposed under § 4 of the NGA to adopt an FTW rate structure, but FERC rejected this plan. *Transcon. Gas Pipe Line Corp.*, 72 F.E.R.C. ¶ 63,003 (1995), *modified*, 76 F.E.R.C. ¶ 61,021 (1996), *on reh'g*, 77 F.E.R.C. ¶ 61,270 (1996), *on reh'g*, 79 F.E.R.C. ¶ 61,205 (1997). Transco's proposal would have eliminated IT-Feeder priority and given FT-conversion shippers flexible rights to use the supply laterals, though capacity would not be guaranteed at any specific points on the laterals. 76 F.E.R.C. at 61,054. If multiple FT-conversion shippers wanted to use a lateral, and it did not have enough total capacity for their needs, capacity would be allocated pro rata. *Id.* Transco would not sell any higher priority service on the laterals, and a two-part FT rate would be charged for each zone. The full fixed costs of the supply laterals would be allocated to the FT shippers' reservation charges, as demand for IT service would no longer be taken into account in calculating that charge. 72 F.E.R.C. at 65,011.

FERC rejected this proposal because the changes modified Transco's contracts with its shippers. 76 F.E.R.C. at 61,061. On

appeal, we queried whether the proposed changes would be acceptable under the framework established by the Supreme Court. *Exxon Corp. v. FERC*, 206 F.3d 47, 52 (D.C. Cir. 2000). Under the *Mobile-Sierra* doctrine, "FERC may modify a contract rate provision if (but only if) the 'public interest' so requires." *Id.* at 49 (discussing *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956), and *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956)). However, *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division*, 358 U.S. 103, 110-15 (1958), allows pipeline companies to change their rates if their contracts contain clauses (now known as "*Memphis* clauses") reserving the right to do so. *Exxon*, 206 F.3d at 51-52. We remanded the case for FERC to explain why the alleged changes to Transco's contracts would not be permitted under the contracts' *Memphis* clauses.

On remand, FERC acknowledged that the *Memphis* clauses anticipated changes to the rates, terms, and conditions of contractual service but concluded the same clauses did not allow Transco to force customers to accept additional service. *Transcon. Gas Pipe Line Corp.*, 95 F.E.R.C. ¶ 61,322, at 62,140, *on reh'g*, 96 F.E.R.C. ¶ 61,142 (2001). If Transco's FTW proposal were accepted, FERC reasoned, the FT shippers would be required to pay for service on the supply laterals, although they had not contracted for this service. On appeal from that remand, we again remanded the case to FERC for further explanation. *Exxon Mobil Corp. v. FERC*, 315 F.3d 306 (D.C. Cir. 2003) (*Exxon Mobil I*). We found FERC's arguments to be plausible but detected within those arguments a possible conflict with an earlier FERC order, issued in 1999, where FERC rejected Transco's proposal to implement a "firm transportation supply lateral" (FTSL) rate structure. *Transcon. Gas Pipe Line Corp.*, 86 F.E.R.C. ¶ 61,175, *reh'g denied*, 88 F.E.R.C. ¶ 61,135 (1999). In the 1999 proposal, Transco sought to replace its IT-Feeder service on the supply laterals with uninterruptible FTSL

service; Transco would charge a two-part rate (a reservation charge and a volumetric charge) for use of the laterals rather than the one-part rate currently in place for IT service. 86 F.E.R.C. at 61,607. The maximum rate charged for FTSL service on the supply laterals in a zone would be the same as the maximum rate charged for FT service on the mainline in that zone. *Id.* at 61,608. However, within each zone, shippers purchasing FTSL capacity would only have flexible access to secondary points on the supply laterals (not the mainline), and FT-conversion shippers would only have flexible access to secondary points on the mainline (not the supply laterals). *Id.* FERC objected to this plan because both sets of shippers would pay the full reservation charge for service in a zone; thus, under Order No. 636, both should receive flexible access to secondary points throughout the zone. *Id.* at 61,609.

In *Exxon Mobil I*, we spotted a possible inconsistency: In denying the FTSL proposal, FERC appeared to indicate that if Transco eliminated its IT-Feeder service, then the FT-conversion shippers would be entitled to flexible access to the supply laterals without a contract change; however, in rejecting the 1995 FTW proposal, FERC had concluded that providing flexible access to the supply laterals would abrogate the contracts of FT-conversion shippers. *Exxon Mobil I*, 315 F.3d at 310-11. This apparent contradiction led to our second remand.

## III

We must set aside FERC's actions if they are arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). We are "particularly deferential to the Commission's expertise" in ratemaking cases, which involve "complex industry analyses and difficult policy choices." *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1431 (D.C. Cir. 1996). After we remanded this case for a second time, FERC issued another

order in which it explained why the rejection of both plans was consistent. *Transcon. Gas Pipe Line Corp.*, 104 F.E.R.C. ¶ 61,171 (2003), *on reh'g*, 107 F.E.R.C. ¶ 61,156 (2004).

FERC frames much of its argument in terms of the distinction between "primary" and "secondary" rights, stating that while secondary access rights could be given to a shipper without requiring contract modification, forcing a shipper to receive and pay for additional primary service would impermissibly modify the shipper's contract. 104 F.E.R.C. at 61,637. Because Transco's FTW proposal granted primary rights on the supply laterals to FT-conversion shippers, FERC concluded the FTW proposal would require the shippers' contracts to be modified. *Id.* at 61,637-39. On the other hand, in denying Transco's FTSL proposal, FERC noted that FT-conversion shippers would be entitled to only secondary rights on the supply laterals if the IT-Feeder service were eliminated. *Id.* at 61,639. Transco and Indicated Shippers dispute FERC's use of the terms "primary" and "secondary," claiming the FTW proposal would only give FT-conversion shippers secondary rights on the supply laterals.

FERC contends the rights granted under the FTW proposal are properly characterized as "primary" because Transco would be forced to reserve capacity on the supply laterals for the FT-conversion shippers. Therefore, as no higher priority service would be sold, the FTW plan would shift the fixed costs allocated to the supply laterals solely onto the FT-conversion shippers, whereas granting "secondary" rights would not do so. *Id.* This rationale is at the heart of the case (i.e., the allocation of the annual $50 million cost has motivated the past dozen years of litigation); much of the rest of the debate over the meaning and applicability of the terms "primary" and "secondary" obscures the real substance of the dispute.

Under Transco's current rate structure, the one-part rate charged to IT shippers for each unit transported is equal to the total two-part rate that an FT-conversion shipper pays per unit.[5] One component of that two-part FT rate is the reservation charge, which guarantees the availability of shipping capacity. The reservation charge for a zone is calculated by dividing the fixed costs allocated to the zone by the total amount of service—both FT *and* IT—expected in the zone. Hence, the more gas projected to be shipped through a zone via IT service, the lower the FT-conversion shippers' reservation charge will be. The burden of those savings is then effectively shifted to the IT shippers; because the one-part rate for IT service mirrors the two-part FT rate (including the reservation charge), the charge for IT service incorporates some of the function of recovering fixed costs. In essence, Transco recovers part of the fixed costs for each zone through the FT-conversion shippers' reservation charges, and the rest of the fixed costs through the IT shippers' one-part charges.

Under the FTW proposal, though, IT-Feeder service on the supply laterals is eliminated. FT-conversion shippers would be given flexible access to the supply laterals, but their reservation charges would also increase, as IT shippers would no longer be bearing part of the fixed costs of the zone. The result of this change would be the same as if Transco were to add service in a new zone onto existing contracts—FT service would be expanded to new parts of the pipeline system, but a greater reservation charge would be required, in order to recover that new area's fixed costs. In this sense, the supply laterals are

---

[5] The two rates are equal assuming the FT-conversion shipper uses all the capacity it reserved. If the FT-conversion shipper did not use its entire reserved capacity, its average per-unit cost would be higher, as it would have already paid a larger reservation charge than necessary.

virtually a separate zone in the present system. Though the laterals are designated as parts of Transco's existing zones, paying the reservation charge for FT service in a zone does not currently give a shipper access to supply laterals within that zone; nor does paying for access to a supply lateral give an IT shipper the right to use the mainline in the same zone. Two transactions are required to purchase capacity for shipping gas on the supply laterals and the mainline within one zone.

Hence, requiring FT-conversion shippers to pay an increased reservation charge for access to the laterals is equivalent to forcing them to accept service in an additional zone, for which they would have to pay a new reservation charge. Regardless of the labels placed on the proposed change, the substantive effect of the FTW plan would be to require FT-conversion shippers to take on a new service. Although they benefit from the existence of the IT-Feeder priority, the FT-conversion shippers never contracted for service on the supply laterals. Because the FTW proposal would effectively add service to these shippers' contracts, not merely change contractual rates or terms, the scope of the change exceeds that which is permitted under *Memphis* clauses. *See Exxon Mobil I,* 315 F.3d at 310.

This analysis is consistent with FERC's denial of Transco's FTSL proposal. Order No. 636 requires that any FT shipper who pays the reservation charge for a zone be afforded flexible secondary access to other points in the zone. As FT-conversion shippers as a class are not currently paying the "full" reservation charge for each zone (i.e., the IT shippers also pay part of the fixed costs for each zone—the part allocated to the laterals), they are not currently entitled to flexible access to secondary points on the supply laterals. Flexible access may be acquired, if a shipper desires it, through purchasing separate IT service.

In the FTSL proposal, Transco sought to sell FT service on the supply laterals. In each zone, FTSL customers would have been charged the same two-part rate as the FT-conversion shippers; thus, all FT shippers within a zone (whether using the mainline or the supply laterals) would be paying the same reservation charge. Unlike the FTW plan, the FTSL plan would not have forced existing FT-conversion shippers to bear the full fixed costs of a zone on their own, as they would share this burden with the FTSL shippers. At the same time, the fixed costs for the whole zone would be divided up among all the FT shippers in the zone proportionally, through equal reservation charges. Therefore, the supply laterals would no longer have been virtually a separate zone under this plan. Under Order No. 636, then, all the zone's FT shippers—both FT-conversion shippers and FTSL shippers—would be entitled to flexible access to secondary points everywhere within the zone, on the mainline and the supply laterals, because as a class they would be paying the full reservation charge for the zone (by bearing all the fixed costs).

This key difference between the FTW and the FTSL proposals explains why FERC rejected both—although for different reasons. In a system where FT shippers are paying for the full fixed costs of a zone (such as the FT-conversion shippers and the FTSL shippers together would have done under the FTSL proposal), all of them would be entitled to flexible access to secondary points throughout the zone. The FTSL proposal was rejected because this flexible intra-zone access was not included. In Transco's current system, on the other hand, the FT shippers are *not* bearing the full fixed costs of the zone; while the FT-conversion shippers bear some of the costs, the IT shippers bear the rest. In the FTW proposal, IT volume would no longer be included in the calculation of reservation charges, yet no new group of FT shippers (such as the FTSL shippers) would be added to share the FT-conversion shippers' burden in

bearing the fixed costs for the zone. Thus, rather than "giving" the FT-conversion shippers flexible secondary access to points in the zone, Transco would be extending the FT-conversion shippers' FT service in essentially the same manner as if an extra stretch of pipeline (with the attendant fixed costs) were being added to the zone.

In this light, FERC's orders rejecting the FTW and FTSL proposals were consistent. Under the FTSL proposal, the fixed costs of the supply laterals would have been borne by a new group of shippers (rather than the IT shippers); hence, the FT-conversion shippers would not be effectively forced to accept new service, even if those shippers had been given flexible access to the supply laterals. On the other hand, the practical effect of the FTW proposal would have been to extend FT-conversion shippers' service to include virtually a new zone—the supply laterals—as no other shippers would have contributed to bearing the added fixed costs. Transco would essentially be obliged to reserve capacity on the supply laterals for the FT-conversion shippers as a class. As this would effectively add service obligations to existing contracts, the proposal exceeded Transco's ability to change rates, terms, and conditions under the *Memphis* clauses.

IV

Transco and Indicated Shippers contest FERC's use of the terms "primary" and "secondary," claiming the FTW proposal would only give the FT-conversion shippers "secondary" service on the supply laterals. They point out that no specific access points would be granted, while primary rights are generally granted at specific points. Similarly, the FT-conversion shippers' access would only have the highest priority as a class; individual shippers' requests for capacity would be subject to pro rata allocation with requests from other FT-conversion

shippers if demand is high. However, these arguments are only relevant to the quality of the service on the laterals—whether the service is as "firm" as service on the mainline—not whether forcing the FT-conversion shippers to pay for the service would entail contractual change. *Cf. El Paso Natural Gas Co.*, 99 F.E.R.C. ¶ 61,244, at 62,001 (2002) (stating that daily pro rata allocation of capacity is unacceptable for service that is supposed to be "firm"). In other words, these arguments by Transco and Indicated Shippers merely question the categorization of the rights as "primary"; yet, even if we were to decide that the rights were neither purely "primary" nor purely "secondary," but a hybrid of the two, that decision would not be dispositive. The label attached to the rights does not affect whether the plan would effectively add service to the contracts.

Transco and Indicated Shippers also claim that replacing the IT-Feeder system with the FTW plan merely continues a service FT-conversion shippers were already paying for "directly or indirectly." This argument is relevant but inaccurate. In a sense, the IT-Feeder priority does act as a substitute for the flexible point access otherwise required by Order No. 636; FT-conversion shippers benefit from the scheduling superiority that IT-Feeder priority gives relative to other IT service. Under the current plan, FT-conversion shippers would be able to acquire capacity in the supply laterals by purchasing IT service. If they had all done so, then transforming that IT service into FT service subject to pro rata allocation would essentially be continuing the same service. However, producers—rather than the FT-conversion shippers—have actually purchased the IT service. If the producers were able to pass that cost on to the FT-conversion shippers, then perhaps the FT-conversion shippers would be "indirectly" paying for access to the supply laterals already.[6] In

---

[6] Even if the FT-conversion shippers were "indirectly" paying for access to the supply laterals, however, that cost-shifting would not

reality, though, "Transco and the Indicated Shippers assert that they are often forced to absorb the expense . . . to ensure that their prices appear competitive with producers on other pipelines." *Exxon Mobile I*, 315 F.3d at 308. While Indicated Shippers (and therefore Transco) are understandably dissatisfied with the arrangement, the claimed losses directly contradict the suggestion that the FT-conversion shippers are already "indirectly" paying for service on the supply laterals.

Finally, Transco and Indicated Shippers suggest Transco should be allowed to convert to an FTW rate structure because FERC allows the rest of the industry to use such systems. This argument would be persuasive if Transco were just now unbundling its service; however, when it did unbundle its service back in 1991, Transco entered into settlement agreements with its shippers. The obligations imposed by the settlement agreements cannot be ignored. The FTW proposal would alter Transco's existing contracts, regardless of whether it would have been an acceptable system to implement in the initial settlements.

In summary, the FTW proposal would have required Transco to reserve capacity on the supply laterals for the FT-conversion shippers, as no higher-priority service on the supply laterals would be sold. As the FT-conversion shippers would thus be forced to bear the entire burden of the fixed costs for each zone, without the addition of another group of FT shippers, Transco would essentially be amending their contracts to require them to take service in a new area. Granting "secondary" rights

---

necessarily be legally relevant. Whether or not the producers are able to pass on the cost of IT service through higher gas prices, the FT-conversion shippers are not obligated *by their contracts with Transco* to pay for IT service. Requiring them to take such service would alter their contracts.

on the laterals, with a higher-priority service being sold to another group of shippers, would avoid this problem; FERC's rejection of the FTSL proposal was consistent with this reasoning. Hence, FERC did not act arbitrarily or capriciously in rejecting Transco's NGA § 4 filing.

V

Under § 5 of the NGA, FERC may find existing rates or charges for the transportation or sale of natural gas to be unjust or unreasonable; FERC may then determine what the just and reasonable rate should be. 15 U.S.C. § 717d(a). If the proposed change would require a modification to a contract rate provision, FERC may order the change, pursuant to the *Mobile-Sierra* doctrine, "if (but only if) the 'public interest' so requires." *Exxon*, 206. F.3d at 49. Indicated Shippers argue that even if the FTW proposal is not a contract modification permitted by the FT-conversion shippers' *Memphis* clauses, FERC's refusal to exercise its power under § 5 to require a contract modification was arbitrary because the IT rates are unjust and unreasonable and because the FTW proposal is in the public interest. We did not reach this issue in either *Exxon* or *Exxon Mobil I*, deferring our analysis until the NGA § 4 issues were resolved. *See Exxon*, 206 F.3d at 48-49; *Exxon Mobil I*, 315 F.3d at 311.

Order No. 636 specifies that pipeline companies should offer FT service, charging a two-part rate; all the fixed costs allocated to that service should be recovered through the reservation fee. Order No. 636 at 13,293; *see also* 18 C.F.R. § 284.7. This policy was intended to promote transparency in pricing, with the goal of encouraging competition between pipelines. Order No. 636 at 13,293. However, this requirement was not to be "rigidly" enforced. *Id.*; *see also* 18 C.F.R. § 284.7(e) (stating that FERC may permit a pipeline to recover some fixed costs through a volumetric charge). As FERC aptly

stated during oral arguments, the policies in Order No. 636 are not sacrosanct.

Transco initially proposed the FTW plan as a method of complying with the requirements of Order No. 636, because implementing FT service and two-part rates on the supply laterals would increase transparency in pricing; nonetheless, FERC rejected the proposal. *Transcon. Gas Pipe Line Corp.*, 63 F.E.R.C. ¶ 61,194, *on reh'g*, 65 F.E.R.C. ¶ 61,023 (1993). As discussed above, the FTW plan attempts to shift costs from one group of shippers to another. Significantly, this contract change would require more than a mere change in rate design, *see, e.g.*, *Texaco Inc. v. FERC*, 148 F.3d 1091 (D.C. Cir. 1998) (upholding FERC's abrogation of private contracts and upholding conversion from modified fixed variable to straight fixed variable pricing), but instead would impose new firm service upon the FT-conversion shippers. Under § 5, FERC may reject unjust and unreasonable rates and prescribe a new rate that is just and reasonable. It may not, however, require distributors to accept or to pay for additional service. *See Alabama-Tennessee Natural Gas Co. v. Fed. Power Comm'n*, 417 F.2d 511, 514-15 (5th Cir. 1969) ("[T]he Commission has no authority to require a local distributor to contract for, purchase, or accept delivery of natural gas.").

Under *Mobile-Sierra*, "a heavy burden must be met before a customer . . . can be deprived against his will of the benefits of his bargain." *Town of Norwood v. FERC*, 587 F.2d 1306, 1310 (D.C. Cir. 1978).[7] Indicated Shippers have not shown that the

---

[7] Similarly, a company "is not typically 'entitled to be relieved of its improvident bargain.'" *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 710 (D.C. Cir. 2000) (quoting *Sierra*, 350 U.S. at 355). "Despite recent cynicism, sanctity of contract remains an important civilizing concept"; moreover, "'the general rule of freedom

public interest in price transparency outweighs the harm of the cost reallocation that the FTW plan would entail, although they do argue that the FT-conversion shippers should be forced to pay for the benefit they receive from the IT-Feeder priority. The circumstances under which § 5 of the NGA allows FERC to order rate changes that are "in the public interest" include circumstances such "as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956). Indicated Shippers have not demonstrated that one of these situations, or anything comparable, is present to justify contract abrogation. Moreover, FERC has clearly acknowledged that Transco could implement FT service on the supply laterals without requiring the FT-conversion shippers to accept service for which they have not contracted. For example, Transco could officially establish the supply laterals as a separate zone and allow shippers to purchase FT or IT service in that new zone. *See* 104 F.E.R.C. at 61,640. Hence, even if the public interest in the policies behind Order No. 636 did rise to the level that would justify contract alterations, this situation does not require that one policy be sacrificed to satisfy the other. FERC did not abuse its discretion in deciding not to implement the FTW plan under § 5 of the NGA.

---

of contract includes the freedom to make a bad bargain.'" *Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1460 (9th Cir. 1988) (citations omitted). While Indicated Shippers may regret purchasing Transco's IT service, "'[w]ise or not, a deal is a deal,'" and therefore "people must abide by the consequences of their choices." *Id.* (alteration in the original) (citations omitted).

20

VI

For the foregoing reasons, the petitions for review are denied.

*So ordered.*